Douglas J. Pick, Esq.
Eric C. Zabicki, Esq.
**PICK & ZABICKI LLP**
*Counsel to the Debtor*
369 Lexington Avenue, 12th Floor
New York, New York 10017
(212) 695-6000

Michael Levine, Esq.
**LEVINE & ASSOCIATES, P.C.**
*Proposed Special Litigation Counsel to the Debtor*
15 Barclay Road
Scarsdale, NY 10583

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In re:

                    :      **Chapter 11**

**CONGREGATION BIRCHOS YOSEF,**   **Case No. 15-22254 (RDD)**

                    :

         **Debtor.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**CONGREGATION BIRCHOS YOSEF,**  :   **Adv. Proc. No. 15-_____ (RDD)**

             **Plaintiff,**  :

      - against -

                    :

**MORDECHAI SHLOMO GLATZER, CHAIM**
**BRIZEL, MOSHE B. FRIEDMAN, ABRAHAM** :
**SCHWARTZ, YECHIEL YOEL LAUFER,**
**YISROEL DAVID ROTTENBERG and JOHN** :
**DOES NOS. 1 THROUGH 10,**

           **Defendants.**  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**COMPLAINT FOR MONEY DAMAGES AND ACCOUNTING**
**FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING BREACH**
**OF FIDUCIARY DUTY, CONVERSION AND/OR FRAUD**
**AND FOR RESCISSION OF FRAUDULENTLY INDUCED AGREEMENT**

Plaintiff-Debtor Congregation Birchos Yosef (the "Debtor"), by and through its undersigned attorneys, as and for its Complaint against Mordechai Shlomo Glatzer ("Glatzer"), Chaim Brizel ("Brizel"), Moshe B. Friedman ("Friedman" and, along with Glatzer, the "Trustee-Defendants"), Abraham Schwartz Schwartz"), Yechiel Yoel Laufer ("Laufer"), Yisroel David Rottenberg ("Rottenberg") and John Does Nos. 1 Though 10 (collectively, the "Defendants"), respectfully alleges as follows:

## NATURE OF ACTION AND THE RELIEF SOUGHT

1. The Debtor's financial collapse and resulting chapter 11 filing was precipitated by certain wrongful and fraudulent actions of the Debtor's former Board of Trustees (which had been comprised of the Trustee-Defendants) and the Debtor's former purported President, Brizel, in concert with the other Defendants. Said actions were part of a nefarious plot by the Defendants to convert funds rightfully belonging to the Debtor, to divest the Debtor of all but one of its real properties and to convert for themselves the Debtor's remaining real property for no consideration.

2. In this regard, and among other things, the Trustee-Defendants and Brizel, with the assistance and/or involvement of the other Defendants: (a) opened a secret bank account into which donations intended to be made to the Debtor by certain of its benefactors were deposited and were then used exclusively for the personal benefit of the Trustee-Defendants; (b) rented real properties owned by the Debtor to third-parties for virtually no consideration and/or diverted rental income payable to the Debtor to their own use; (c) caused the Debtor to borrow funds and to pledge certain of the Debtor's real properties as collateral for the repayment of such amounts and then intentionally caused the Debtor to default with the goal of purchasing the real properties at the resulting foreclosure sales; (d) attempted to sell certain real properties owned by the Debtor and secretly agreed to receive a personal cash benefit in connection therewith; and (e) conveyed a real

property owned by the Debtor to an entity owned and controlled by the Defendants for virtually no consideration

3.   For these reasons and those more fully alleged herein, the Debtor brings this adversary proceeding against the Defendants: (a) to recover money damages for injuries caused by, and to compel an accounting from, the Defendants resulting from and in connection with: (i) their breach of their fiduciary duties as trustees and/or officers of the Debtor and/or their having aided and abetted same; (ii) their conversion of property belonging to the Debtor; and/or (iii) their fraudulent actions concerning the Debtor's assets and other financial affairs; and (b) for rescission of a certain resolution agreement between the Debtor and certain of the Defendants based upon the Defendants' fraudulent inducement with regard thereto, pursuant to New York statutory and common law and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## JURISDICTION AND VENUE

4.   The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

5.   This case is "core" proceeding as defined by 28 U.S.C. §§ 157(b)(2)(A), b(2)(E) and/or (b)(2)(O).

6.   To the extent that any claims alleged by the Debtor herein may be determined to be "non-core" matters, the Debtor consents to the entry of final orders and judgments by this Court with regard to all claims and issues concerning or arising in connection with this adversary proceeding..

7.   This Court has personal jurisdiction over each of the Defendants.

8.   Pursuant to Bankruptcy Rule 7020, relief is asserted against the Defendants jointly and severally, and a single complaint is being brought against all of the Defendants, as the allegations

against each of the Defendants essentially arise out of the same transaction, occurrence, or series of transactions or occurrences and said allegations raise common questions of law and fact as to all Defendants

## GENERAL ALLEGATIONS AND THE PARTIES

9.   At all times relevant to this Complaint, the Debtor was, and still is, a religious corporation, organized and existing pursuant to Article 10 of the Religious Corporation Law of the State of New York (the "RCL"), with a principal place of business in the County of Rockland.

10.   The Debtor is subject to the Not-for-Profit Corporations Law of the State of New York ("N-PCL") because it was "formed for charitable, educational, religious, scientific, literary or cultural purposes" within the purview of NCL § 201(b).

11.   On February 26, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with this Court and an Order for Relief was simultaneously entered.

12.   At all times relevant to this Complaint, Defendant Mordechai Shlomo Glatzer ("Glatzer") was, and still is, an individual residing in the State of New York, County of Rockland.

13.   At some of the times relevant to this Complaint, Glatzer claimed to be, and purported to act as, vice-President and/or "Admin Manager" and/or Trustee sitting on the Debtor's former Board of Trustees and, as such, had a fiduciary duty under New York law to act in the best interests of the Debtor at all times.

14.   At all times relevant to this Complaint, Defendant Chiam Brizel ("Brizel") was, and still is, an individual residing in the State of New York, County of Rockland.

15.   At some of the times relevant to this Complaint, Brizel claimed to be, and purported to act as, President of the Debtor and/or as a Trustee sitting on the Debtor's former Board of

Trustees and, as such, had a fiduciary duty under New York law to act in the best interests of the Debtor at all times.

16.   At all times relevant to this Complaint, Defendant Moshe B. Friedman ("Friedman") was, and still is, an individual residing in the State of New York, County of Rockland.

17.   At some of the times relevant to this Complaint, Friedman claimed to be, and purported to act as, President of the Debtor and/or as a Trustee sitting on the Debtor's former Board of Trustees and, as such, had a fiduciary duty under New York law to act in the best interests of the Debtor at all times.

18.   At all times relevant to this Complaint, Defendant Abraham Schwartz was, and still is, an individual residing in the State of New York, County of Rockland.

19.   At some of the times relevant to this Complaint, Schwartz claimed to be, purported to act as, a Trustee sitting on the Debtor's former Board of Trustees and, as such, had a fiduciary duty under New York law to act in the best interests of the Congregation at all times.

20.   At all times relevant to this Complaint, Defendant Yechiel Yoel Laufer ("Laufer") was, and still is, an individual residing in the State of New York, County of Rockland.

21.   At all times relevant to this Complaint, Laufer was, and still is, the owner of Devash Dairy Farms, Inc., a New York business corporation formed on December 26, 2012.

22.   At some of the times relevant to this Complaint, Laufer claimed to be, and purported to act as, an agent of the Debtor and, as such, had a fiduciary duty under New York law to act in the best interests of the Debtor at all times.

23.   At all times relevant to this Complaint, Defendant Yisroel David Rottenberg ("Rottenberg") was, and still is, an individual residing in the State of New York, County of Rockland.

24.  At some of the times relevant to this Complaint, Rottenberg was an employee of the Debtor, and claimed to be, and purported to act as, Manager of the Debtor and, as such, had a fiduciary duty under New York law to act in the best interests of the Congregation at all times.

25.  At all times relevant to this Complaint, Defendants John Does Nos. 1-10 were, and still are, individuals whose specific identities are presently unknown to Debtor, but which individuals are believed to have conspired to participate in, or aided and abetted, the conduct complained of herein.

## FACTUAL ALLEGATIONS COMMON TO EACH COUNT

### I.    Statutory and Corporate Restrictions Concerning Alienation of Debtor's Property and Corporate Authority to Bind the Debtor

26.  Pursuant to § 12 of the RCL, a religious corporation is required to obtain leave of the Supreme Court of the State of New York in order to: (a) sell or transfer any of its real property; or (b) lease any of its real property for a term exceeding five years.

27.  Pursuant to § 511(b) of the NCL, a not-for-profit corporation is required to obtain the approval of the Attorney General of the State of New York (the "Attorney General") in order: (a) sell or transfer any of its real property; or (b) lease any of its real property for a term exceeding five years.

28.  Pursuant to § 510(a)(1) of the NCL, a not-for-profit corporation which has voting members (as is the Debtor) is required to obtain the approval of said members in order to: (a) sell or transfer any of its real property; or (b) lease any of its real property for a term exceeding five years.

29.  Pursuant to § 510(a)(1) of the NCL, the not-for-profit corporation's board must first adopt a resolution concerning the proposed sale or lease of real property, then the board resolution

must be submitted to a vote at an annual or special meeting of the corporation's members entitled

to vote on it, and notice of the meeting must be given to each member.

30.  The members of the not-for-profit corporation may approve the proposed transaction

according to the terms of the board resolution, or authorize the board to modify the terms and

conditions of the proposed transaction, all by a 2/3 vote.

31.  In addition to the above-referenced statutory mandates, the By-Laws of the Debtor in

effect at all times material herein (the "By-Laws") provide, among other things, that "[n]o real

estate of the corporation shall be leased or sold or otherwise disposed of except" with the prior

unanimous approval of the Board of Trustees and 2/3 of the Debtor's membership (i.e., its

congregants).

32.  The By-Laws further require that a Notice of Special Meeting concerning such a vote

be posted "on the main bulletin board of the synagogue premises" upon ten (10) days prior notice.

33.  The By-Laws further state that: (a) only the Debtor's president has the authority to

execute contracts on behalf of the Debtor; and (b) that the Debtor's vice-president may only act on

behalf of the Debtor in the event of the death, resignation, vacancy, absence or inability of the

President to perform his duties.

II.    **Defendants Improper Encumbrance of the Debtor's
        Properties and Assets and Intentional Mortgage Default**

34.  On or about January 27, 2012, the Trustee-Defendants and Laufer caused the Debtor

to execute and enter into, among other documents (collectively, the "TD Bank Loan Documents"):

(a)      a Credit Agreement with non-party TD Bank, N.A. ("TD Bank") for: (a) a term

loan to the Debtor in the principal amount of $7,200,000.00; and (b) revolving credit loans up to

the maximum aggregate principal amount of $500,000.00 (collectively, the "TD Bank Loan");

(b)      a Term Loan Note in the principal amount of $7,200,000.00 in favor of TD Bank;

(c)      a Revolving Credit Note in the principal amount of $500,000.00 in favor of TD Bank;

(d)      a Mortgage and Mortgage Consolidation, Modification and Extension Agreement in the principal amount of $7,700,000.00 (the "TD Bank Mortgage");

(e)      an Assignment of Leases and Rents in favor of TD Bank; and

(f)      a Security Agreement in favor of TD Bank.

35.   The Loan Documents were executed by Friedman, purportedly acting as President of the Debtor.

36.   On or about January 27, 2012, amounts totaling not less than $6,573,024.98 of the $7,700,000.00 proceeds of the TD Bank Loan (the "TD Bank Loan Proceeds") were paid by TD Bank on account of which TD Bank was assigned the following mortgages (the "Acquired Mortgages"):

(a)      a mortgage held by Signature Bank against certain real property owned by the Debtor known as and located at 201 Route 306, Spring Valley, New York (the "201 Route 306 Property") securing an indebtedness then totaling $1,700,073.99;

(b)      a mortgage held by Harvey Klein against certain real property owned by the Debtor known as and located at 900-906 Route 45, Spring Valley, New York (the "Route 45 Property") securing an indebtedness then totaling $3,500,000.00; and

(c)      a mortgage held by VNB New York Corp. against certain real property owned by the Debtor known as and located at 4 Milton Place, Spring Valley, New York (the "4 Milton Place Property") securing an indebtedness then totaling $1,372,950.99.

37.   Upon information and belief, the $1,126,975.02 balance of the TD Bank Loan Proceeds remaining after the payments made by TD Bank in connection with the Acquired

Mortgages was released to the Debtor under the care and supervision of the Defendants (the "TD Bank Loan Surplus").

38.  Upon information and belief, as the date of the above-described transactions, the combined values of the 201 Route 306 Property, the Route 45 Property and the 4 Milton Place Property which were subject to the Acquired Mortgage was substantially in excess of the TD Bank Loan Proceeds.

39.  Nevertheless, by way of the Mortgage and Mortgage Consolidation, Modification and Extension Agreement, the Trustee-Defendants and Laufer unnecessarily caused the Debtor to grant TD Bank mortgage liens against the following additional real properties owned by the Debtor as security for the Debtor's performance in connection with the TD Bank Loan:

(a)     certain real property owned by the Debtor known as and located at 78 South Main Street, Spring Valley, New York (the "78 South Main Street Property"); and

(b)     certain real property owned by the Debtor known as and located at 6 Milton Place, Spring Valley, New York (the "6 Milton Place Property").

40.  Prior to the above-described transactions, neither the 78 South Main Street Property nor the 6 Milton Place Property was subject to any mortgage, lien or encumbrance of any kind (together, the "Previously Unencumbered Properties").

41.  As a result of the foregoing, as of January 12, 2012, the 201 Route 306 Property, the Route 45 Property, the 4 Milton Place Property,  and the Previously Unencumbered Properties (collectively, the "Mortgaged Properties") were subject to the TD Bank Mortgage serving as security for the repayment of the $7,700,000.00 TD Bank Loan Proceeds.

42.   The Trustee-Defendants and Laufer, assisted by Rottenberg, intentionally caused the Debtor to default in the performance of its obligations in connection with the TD Bank Loan including:

(a)   causing the Debtor to fail to pay the monthly payments due to TD Bank on December 1, 2012 and each month thereafter;

(b)   causing the Debtor to fail to pay the premiums associated with insurance policies covering the Mortgaged Properties; and/or

(c)   causing the Debtor to fail to timely pay real estate taxes associated with the Mortgaged Properties which resulted in the accrual of and the commencement of a proceeding to foreclose tax liens against certain of the Mortgaged Properties.

43.   On February 22, 2013, and as a result of the foregoing improper actions of the Defendants, TD Bank commenced an action in the Supreme Court of the State of New York, County of Rockland (the "Supreme Court") (Index No. 30988/2013), seeking to foreclose the TD Bank Mortgage (the "Foreclosure Action").

44.   On December 4, 2014, a Judgment of Foreclosure and Sale was entered by the Supreme Court in favor of TD Bank in the aggregate amount of $9,037,109.58 and directing that each of the Mortgaged Properties be sold at public auction.

45.   By way of a proof of claim filed in the Debtor's chapter 11 case, TD Bank has asserted that, as of the Petition Date, the Debtor's obligations to TD Bank totaled not less than $9,224,289.16.

46.   TD Bank has further asserted that interest and attorneys' fees payable by the Debtor to TD Bank continue to accrue at the rate of not less than $2,228.33 per diem.

47. Upon information and belief, the foregoing transactions with TD Bank and the Debtor's defaults thereunder were intentionally undertaken by the Trustee-Defendants and Laufer in derogation of their duties as Trustees and/or officers of the Debtor as part of a fraudulent scheme (in which TD Bank was an unwitting participant) to personally enrich themselves at the Debtor's expenses by acquiring title to some or all of the Mortgaged Properties.

48. In furtherance of their scheme to denude the Debtor of all of its real properties, and as set forth in specific detail herein, the Trustee-Defendants and Laufer unilaterally decided to sell the 4 Milton Place Property, the 78 South Main Street Property and the 201 Route 306 Property allegedly to partially pay down the secured obligations owed to TD Bank, but actually to obtain personal benefits and an interest in, at least, the Route 45 Property, free and clear of any encumbrances thereon, either by way of fraudulent, below market, private sales, or at "fire sale" when offered at public foreclosure auctions.

49. In fact, at the time of the above-described transactions, the Route 45 Property was being occupied by an entity named Bais Chinuch L'bonois, Inc. ("Bais Chinuch") for the purposes of operating a religious girl's school.

50. Upon information and belief, Laufer is, and at all times material herein was, an officer, director, principal, shareholder and/or person in control of Bais Chinuch.

51. Upon information and belief, Schwartz is, and at all times material herein was, an officer, director, principal, shareholder and/or person in control of Bais Chinuch.

52. Upon information and belief, Rottenberg is, and at all times material herein was, an officer, director, principal, shareholder and/or person in control of Bais Chinuch.

53.  As more fully alleged herein, the Defendants subsequently attempted to transfer title to the Route 45 Property to Bais Chinuch for the sum of $10.00 and also purported to lease the Route 45 Property to Bais Chinuch for a term of four years at the rate of $1.00 per year.

54.  Additionally, and as of the date hereof, the Trustee-Defendants have not fully accounted for the disposition of the TD Bank Loan Surplus once they were released to the Debtor by TD Bank and while under the care and supervision of the Trustee-Defendants.

55.  As a result of the foregoing actions of the Defendants, among others, the Debtor was rendered completely unable to take actions necessary to either pay off or refinance the TD Bank Mortgage or to pay necessary tax obligations, have caused the Debtor to incur substantial and unnecessary legal fees and expenses and/or have precluded the Debtor form exploiting its ownership interests in its real properties.

### III.    The 4 Milton Place Property

56.  On or about July 30, 2008, the Debtor acquired title to the 4 Milton Place Property from non-party Kale Realty Corp., formerly known as LID FLA Realty ("Kale Realty"), for the purchase price of $2,600,000.00.

57.  The 4 Milton Place Property consists of a parcel of property approximately one acre in size which the Debtor now utilizes as a parking lot for its synagogue.

58.  Upon information and belief, Kale Realty is owned and/or controlled by a non-party individual named Bela Kalman.

59.  On or about April 16, 2013, and in furtherance of the fraudulent plan and scheme described herein, the Defendants, purportedly acting on behalf of the Debtor, entered into a contract to sell the 4 Milton Place Property to Bela Kalman, for the price of $1,000,000.00.

60.  The contract of sale was executed by Defendant Brizel, purportedly acting as President of the Congregation.

61.  On or about June 24, 2013, the Defendants caused to be filed a petition with the Supreme Court of the State of New York to approve the sale of the 4 Milton Place Property (under Rockland County Index No. 33235/2013).

62.  The said petition was executed by Defendant Brizel, purportedly acting as President of the Congregation.

63.  Brizel had never been elected as the President of the Congregation and, therefore, had no right or ability to act in its behalf in connection with the 4 Milton Place Property.

64.  By way of the 4 Milton Place Petition, Brizel claimed that: (a) a Notice of Special Meeting of the Debtor's membership was issued by him on April 5, 2013, for a special meeting to purportedly be held April 15, 2013, to consider the approval of the proposed sale of the 4 Milton Place Property; (b) the Notice of Special Meeting had been posted by him on April 5, 2013; and (c) that a special meeting had actually been held on April 15, 2013 at which the sale was purportedly approved by the Debtor's membership.

65.  Contrary to the representations made by Brizel, no Notice of Special Meeting was ever posted on the main bulletin board of the synagogue premises as required by the By-Laws.

66.  Accordingly, the members of the Debtor had no notice of any special meeting nor any notice of the intent to cause the Debtor to sell the 4 Milton Place Property.

67.  By way of the 4 Milton Place Petition, Brizel further claimed that certain "Minutes Of Special Meeting Of The Members, Board Of Directors And Trustees Of Congregation Birchos Yosef And Resolution To Convey Real Property" had been issued by the Secretary of the Debtor and set forth what had transpired at the purported special meeting.

68.   The purported minutes of the special meeting referenced by Brizel were a mere fabrication which had been falsely prepared by the Defendants and executed by the Secretary of the Debtor at the direction of one or more of the Defendants, including Rottenberg.

69.   Upon information and belief, and at all times material herein, the fair market value of the 4 Milton Place Property was considerably in excess of $1,000,000.00.

70.   The Defendants were aware that the purported sale of the 4 Milton Place Property was not in the best interests of the Debtor.

71.   In fact, in May of 2013, Defendants (through Defendant Rottenberg, purportedly acting on behalf of the Debtor), had entered into a collateral agreement with the purchaser which had provided that: (a) the actual purchase price for the 4 Milton Place Property was $1,425,000.00; (b) the written contract of sale would nonetheless reflect a purported purchase price of only $1,000,000.00; (c) a cash payment of $200,000.00 would be made by the purchaser to Defendants' order at the closing; and (d) the sum of $200,000.00 would, at the election of the Defendants, either be added to the contract purchase price at the closing or paid to a "tax-deductible name" provide by the Defendants.

72.   The existence of the collateral agreement concerning the 4 Milton Street Property was never disclosed by the Defendants to the members of the Debtor, but rather was fortuitously discovered by certain members of the Debtor.

### IV.   The 78 South Main Street Property

73.   On or about August 30, 2006, the Debtor acquired title to the 78 South Main Street Property from non-party Affordable Community, Inc., for the purchase price of $1,500,000.00.

74.   At the time of the acquisition, and in addition to the $1,500,000.00 contract purchase price, the Debtor paid Affordable Community, Inc. another $500,000 to finish the building located

on the property, thereby bringing the aggregate purchase price paid by the Debtor for the 78 South Main Street Property to $2,000,000.00.

75.  The 78 South Main Street Property consists of a parcel of property approximately 0.46 acres in size on which, at all times material herein, a building approximately 6,106 square feet in size, which is utilized as a school for special needs children, is situated.

76.  On or about June 14, 2013, the Defendants, purportedly acting on behalf of the Debtor, entered into a contract to sell the 78 South Main Street Property to Hawaii Properties, Inc., for the purchase price of $1,200,000.00.

77.  The contract of sale was executed by Brizel, purportedly acting as President of the Debtor.

78.  On or about September 11, 2013, the Defendants caused to be filed a petition to approve the sale of the 78 South Main Street Property with the Supreme Court of the State of New York (under Rockland County Index No. 34822/2013) (the "78 South Main Street Petition").

79.  The 78 South Main Street Petition was executed by Brizel, purportedly as President of the Congregation.

80.  By way of the 78 South Main Street Petition, Brizel claimed that: (a) a Notice of Special Meeting of the Debtor's membership was issued by him on May 17, 2013, for a special meeting to purportedly be held May 28, 2013, to consider the approval of the proposed sale of the 78 South Main Street Property; (b) the Notice of Special Meeting had been posted by him on May 17, 2013; and (c) that a special meeting had actually been held on May 28, 2013 at which the sale was purportedly approved by the Debtor's membership.

81.  Contrary to the representations made by Brizel, no Notice of Special Meeting was ever posted on the main bulletin board of the synagogue premises as required by the By-Laws.

82. Accordingly, the members of the Debtor had no notice of any special meeting nor any notice of the intent to cause the Debtor to sell the 78 South Main Street Property.

83. By way of the 78 South Main Street Petition, Brizel further claimed that certain "Minutes Of Special Meeting Of The Members, Board Of Directors And Trustees Of Congregation Birchos Yosef And Resolution To Convey Real Property" had been issued by the Secretary of the Debtor and set forth what had transpired at the purported special meeting.

84. The purported minutes of the special meeting referenced by Brizel were a mere fabrication which had been falsely prepared by the Defendants and executed by the Secretary of the Debtor at the direction of one or more of the Defendants, including Rottenberg.

85. Upon information and belief, and at all times material herein, the fair market value of the 78 South Main Street Property was considerably in excess of $1,200,000.00.

86. The Defendants were aware that the purported sale of the 78 South Main Street Property was not in the best interests of the Debtor.

87. Additionally, at all times material herein, non-party Hamaspik of Rockland County, Inc. ("Hamaspik") was a tenant of the 78 South Main Street Property pursuant to a written lease agreement with the Debtor (the "Hamaspik Lease").

88. Upon information and belief, between on or about September 3, 2013 and November 3, 2013, Rottenberg came into possession of certain checks issued by Hamaspik in payment of its obligations to the Debtor under the Hamaspik Lease in amounts believed to total not less than $30,000.00 (the "Hamaspik Rent Payments").

89. Upon information and belief, Rottenberg subsequently converted the Hamaspik Rent Payments by cashing and/or depositing the Hamaspik Rent Payments and utilizing said monies for his own personal benefit.

V.   **The 201 Route 306 Property**

90.  On or about May 2, 2007, the Debtor acquired title to the 201 Route 306 Property from non-party Monsey Jewish Center for the purchase price of $6,500,000.00.

91.  The 201 Route 306 Property consists of a parcel of property approximately 3.83 acres in size on which, at all times material herein, a building approximately 32,980 square feet in size, which is utilized as a religious school, house of worship and dormitory, is situated.

92.  On or about October 17, 2012, the Defendants caused the Debtor to enter into a Lease Agreement for the 201 Route 306 Property with Yeshiva Ohr Torah for a period of one year at an aggregate annual rental of $400,000.00 (the "Ohr Torah Lease").

93.  The Ohr Torah Lease was executed by Friedman, purportedly acting as President of the Debtor.

94.  The Defendants caused the Debtor to enter into the Ohr Torah Lease with the intention of diverting some or all of the rental income generated thereby to Bais Chinuch.

95.  The By-Laws of the Debtor provide, among other things, that the unanimous vote of the Debtor's Board of Trustees, and a vote by 2/3 of the Debtor's membership, is required to approve all leases of real property belonging to the Debtor.

96.  No meeting of the Debtor's members was held, nor was any vote of the Debtor's members taken, with respect to the Ohr Torah Lease.

97.  Upon the execution of the Ohr Torah Lease on October 17, 2012, Yeshiva Ohr Torah deposited the sum of $322,000.00 into escrow with Kunstlinger & Wohlgemuth, PLLC ("K & W"), a law firm then purporting to act on behalf of the Debtor.

98.  The following date, *i.e.,* on or about October 18, 2012, Laufer instructed K & W to transfer $110,000.00 of the monies received from Yeshiva Ohr Torah to Bais Chinuch.

99.   Friedman, purportedly acting as President of the Debtor, "approved" said diversion of funds to Bais Chinuch.

100.   As of the date hereof, Bais Chinuch has not returned or repaid any portion of the $110,000.00 transferred to it by the Debtor from the escrowed funds.

101.   The Ohr Torah Lease also contained a provision granting to Yeshiva Ohr Torah an option to purchase the 201 Route 306 Property for the price of $6,500,000.00, subject to certain terms, conditions and provisions of the Ohr Torah Lease.

102.   Upon information and belief, and at all times material herein, the fair market value of the 201 Route 306 Property was considerably in excess of $6,500,000.00.

103.   The Defendants were aware that the purported sale of the 201 Route 306 Property was not in the best interests of the Debtor.

104.   In or about June, 2013, Yeshiva Ohr Torah, having not yet exercised the option to purchase, requested an extension in its time to do so.

105.   An extension agreement was then signed which required Yeshiva Ohr Torah to deposit an additional sum of $50,000.00 into escrow with K & W.

106.   The $50,000.00 escrow deposit was made on July 1, 2013.

107.   On July 18, 2013, and purportedly at the direction of the Debtor, K & W: (a) transferred $40,000.00 from the escrow to the firm's checking account; and (b) transferred $40,000.00 to the law firm of Haynes & Boone.

108.   Defendants, as part of their fraudulent plan and scheme described herein, intended to sell the 201 Route 306 Property for below its fair-market value because they had entered into a secret and undisclosed agreement with the prospective purchaser that provided that the Defendants

would receive a secret, "under-the-table," cash payment at the closing of that transaction, and reduce the contractual purchase price by a greater amount as a result.

### VI.    The Route 45 Property

109.   On or about June 11, 2008, the Debtor acquired title to the Route 45 Property from non-party Rockland Jewish Community Center Corp.

110.   Upon information and belief, the purchase price paid by the Debtor for the Route 45 Property was in excess of $6,000,000.00.

111.   The Route 45 Property consists of two parcels of property: (a) 900 Route 45 which is approximately 5.36 acres in size on which, at all times material herein, a building approximately 23,800 square feet, which is utilized as a religious girl's school, is situated; and (b) 906 Route 45 which is a smaller lot with a single family home situated thereon.

112.   On November 18, 2013, at approximately 3:49 p.m., the Defendants caused to be recorded in the office of the Rockland County Clerk, as Document No. 2013-41777, a purported Deed dated November 17, 2013 (the "Route 45 Property Deed"), which purported to convey the Route 45 Property to Bais Chinuch for a purchase price of $10.00.

113.   No transfer tax was paid in connection with the purported conveyance of the Route 45 Property to Bais Chinuch.

114.   The Route 45 Property Deed was executed by Brizel, purportedly acting as President of the Debtor.

115.   The transfer of the Route 45 Property purportedly represented by the Route 45 Property Deed was not legal or enforceable as said transfer had not been approved by the Attorney General, the Supreme Court or the Debtor's members as required under the RCL, the NCL and the By-Laws.

116.  At the time of their attempt to transfer the Route 45 Property to Bais Chinuch, the Defendants knew that said transfer was not legal or enforceable.

117.  Also on November 18, 2013, at 5:22 p.m., the Defendants caused a purported "Memorandum of the Lease" to be recorded in the office of the Rockland County Clerk, as Document No. 2013-41813, concerning a purported lease agreement dated October 17, 2013 between the Debtor, as landlord, and Bais Chinuch, as tenant, with regard to the Route 45 Property (the "Route 45 Property Lease").

118.  The Route 45 Property Lease purported to lease the Route 45 Property to Bais Chinuch for a period of four years at an annual rental price of $1.00 per year.

119.  The Route 45 Property Lease was executed by Glatzer, purportedly acting as vice-president of the Debtor, and Schwartz, as President of Bais Chinuch.

120.  The leasehold purportedly represented by the Route 45 Property Lease was not legal or enforceable as said lease had not been approved by the Attorney General, the Supreme Court or the Debtor's members as required under the RCL, the NCL and the By-Laws.

121.  The execution of the Route 45 Property Lease by Glatzer, purportedly as vice-president of the Debtor, was also a nullity and not binding on the Debtor pursuant to the By-Laws which state that, absent the existence of certain enumerated circumstances not applicable herein, only the President may bind the Debtor to a contract or agreement.

122.  The Defendants intentionally made the term of the Route 45 Property Lease for four years in order to subvert §12 of the RCL which requires the advance approval of the Supreme Court and the Attorney General of any lease made by a religious corporation which is for a period of more than five years.

123.  At the time of their attempt to lease the Route 45 Property to Bais Chinuch, the Defendants knew that said lease was not legal or enforceable.

124.  The Defendants fraudulently executed the Route 45 Property Deed and/or the Route 45 Property Lease with Bais Chinuch, an entity which was, and continues to be, owned and/or controlled by Schwartz, Laufer and Rottenberg (and possibly other Defendants), solely in an attempt to delay the Debtor's exercise of its ownership and possessory rights in and to the Route 45 Property without any authority whatsoever to do so, for substantially less than equivalent value and contrary to the best interests of the Debtor.

125.  The unauthorized purported conveyance of the Route 45 Property by way of the illegal and fraudulent Route 45 Property Deed, as well as the unauthorized and fraudulent Route 45 Property Lease, effectively acted to eject and wrongfully exclude the Debtor from its right and ability to use and control of the Route 45 Property for its own legitimate purposes or to enter into an agreement with any other entity with respect thereto, if the Debtor so chose, for the benefit of the Debtor.

126.  Additionally, as a result of the filing of the fraudulent Route 45 Property Deed, the Tax Assessor for the County of Rockland revoked the then-existing charitable entity real property tax exemption applicable to the Route 45 Property, effective with the filing of the fraudulent Route 45 Property Deed and added a *pro rata* charge for the 2013-2014 school year to the 2014-2015 school tax bill.

127.  This addition assessment totaled $82,085.28.

128.  Moreover, and again as a result of the filing of the fraudulent Route 45 Property Deed, a bill for 2014-2015 town taxes now exists because the then-existing charitable entity real property tax exemption was denied by the Tax Assessor for the County of Rockland.

129.   Such charges will, unless reversed, continue indefinitely into all future tax years.

130.   Said actions were part of the plan, as described herein, by the Defendants to take control of the Route 45 Property and divest the Debtor of its real property without any payment by the entity owned and/or controlled by Defendants.

### VII.   The Secret Bank Account

131.   On or about May 1, 2013, Friedman and Glatzer opened a checking account in the name of the Debtor with KeyBank, under Account # xxxxxxxx4627 (the "Secret Account").

132.   Friedman and Glatzer did not advise the Debtor or its spiritual leader of the opening or the existence of the Secret Account.

133.   Friedman and Glatzer made themselves, and only themselves, signatories on the Secret Account.

134.   Friedman and Glatzer caused KeyBank to issue to each of them, and only to each of them, an ATM/Debit card which permitted them to make purchases which were debited from the Secret Account and/or to withdraw cash from the Secret Account at automatic teller machines.

135.   From May of 2013 through November 12, 2013, the Defendants caused funds that belonged the Debtor to be deposited into the Secret Account totaling, upon information and belief, not less than $26,265.91.

136.   The funds deposited by the Defendants into the Secret Account represented funds given by benefactors of, or contributors to, the Debtor who believed that their donations would be used for Debtor's legitimate purposes.

137.   No checks were ever issued from the Secret Account.

138.   Instead, the ATM/Debit card linked to the account was used to pay for private expenses for Friedman and Glatzer for such things as their personal: (a) car leases and related

expenses; (b) utility and phone bills; (c) grocery purchases; (d) liquor purchases; (e) insurance; (f) personal items; (g) gifts; and (h) other items and expenses entirely unrelated to the Debtor's legitimate purposes.

139.   Friedman and Glatzer also withdrew cash from the Secret Account at automatic teller machines for their personal use.

140.   Neither Friedman nor Glatzer had an authorized expense account with the Debtor, nor were they authorized to use Debtor funds for their personal expenses, and neither of them ever disclosed to the Debtor that they were using donations made to the Debtor for their personal expenses.

141.   Upon information and belief, Friedman and Glatzer used all of the funds improperly deposited into the Secret Account for their own personal use.

142.   Friedman and Glatzer closed the Secret Account on November 12, 2013, when they were forced to resign as Trustees/officers of the Debtor.

143.   When they closed the Secret Account, Friedman and Glatzer destroyed or secreted all records of the Secret Account from the Debtor in an attempt to hide their unauthorized and improper use of Debtor funds for their personal purposes.

### VIII. The Secret Glatzer Life Insurance Policy

144.   On a date presently unknown to the Debtor, Glatzer took out a life insurance policy on his life with The Guardian Life Insurance Company of America ("Guardian") under policy number 6392585 (the "Glatzer Life Insurance Policy").

145.   On February 22, 2009, Glatzer signed and delivered checks totaling $1,427.09 to Guardian from a bank account in the name of the Debtor at the Park Avenue Bank, account number xxxx24062, for premiums due on the Glatzer Life Insurance Policy.

146.   On March 3, 2009, Glatzer sent a letter to Guardian falsely representing to Guardian that: (a) the officers of the Debtor who purportedly authorized the issuance of and the Debtor's payment of the premiums relating to the Glatzer Life Insurance Policy were non-party Aron Markowitz, as "Executive Treasurer", and Glatzer as "Admin. Manager"; and (b) it had purportedly "been agreed upon that the premium on policy #6392585 issued on Mordechai Glatzer who is currently employed by [the Debtor], is to be paid to Guardian from [the Debtor]."

147.   The representations made to Guardian in the March 3, 2009 letter (the "Fraudulent Guardian Letter") were false, and known to Glatzer to be false, in that: (a) Aron Markowitz was not the "Executive Treasurer" of the Debtor at the time; (b) Glatzer was not the "Admin. Manager" of the Debtor at the time; and (c) the Debtor had not agreed to pay the premiums relating to the Glatzer Life Insurance Policy.

148.   Moreover, although the signature of Aron Markowitz purported to appear on the Fraudulent Guardian Letter, Mr. Markowitz never actually signed the same.

149.   Rather, the purported signature of Mr. Markowitz thereupon was forged by, upon information and belief, Glatzer or someone acting on his behalf.

150.   As a result of the foregoing, the Debtor was caused to, and did, unnecessarily pay premiums on the Glatzer Life Insurance Policy, in an aggregate amount presently unknown to the Debtor, but which amount is at least $1,427.09.

## IX. The 2013 Action and Subsequent Resignations

151.   In or about the latter half of 2013, members of the Debtor learned of the Defendants' plans to sell the 4 Milton Place Property, the 78 South Main Street Property, the Route 45 Property and the 201 Route 306 Property.

152.   On September 16, 2013, the members of the Debtor commenced an action in the Supreme Court seeking to, among other things: (a) remove Glatzer and Brizel as Trustees and/or officers of the Debtor; and (b) declare the above-described contracts for sales of properties to be null and void as having been entered into in violation of the RCL, the NCL and/or the By-Laws, and for amounts less than their fair market values (under Rockland County Index No. 34853/2013) (the "Members' Action").

153.   Thereafter, the parties in the Members' Action, personally and through counsel, attempted to negotiate a resolution.

154.   During the course of those negotiations, Brizel and Glatzer never disclosed: (a) the existence of the Secret Account, or their use of the funds therein for their personal benefit; (b) that they had, or had any intent to, transfer title to, or lease, any other property belonging to the Debtor; nor (c) that they had, or had any intent to, take any actions detrimental to the Debtor.

155.   On or about November 7, 2013, the parties in the Members' Action, with the assistance of Rabbi Israel Hager, reached an agreement that, among other things, Brizel and Glatzer would immediately resign as officers and Trustees of the Debtor.

156.   Rabbi Hager prepared an agreement in Hebrew for the parties to execute (the "Initial Resolution Agreement").

157.   Three days later, on November 10, 2013, a meeting of the membership of the Debtor was held at the Debtor's offices located at 53 Decatur Avenue, Spring Valley, New York, wherein Brizel announced his, and the other Trustees, agreement to resign as officers and Trustees of the Debtor.

158.   The meeting was presided over by Brizel, purportedly as President of the Debtor.

159.   At that meeting, the Debtor's membership overwhelmingly rejected the plans by Brizel and Glatzer to transfer the 4 Milton Place Property, the 78 South Main Street Property, and the 201 Route 306 Property and directed them not to transfer or attempt to transfer any other properties, or take any other actions regarding any other Debtor properties before they resigned.

160.   Brizel promised the Debtor's members at that meeting that he had consented to the Initial Resolution Agreement, reiterated that he had agreed to resign, and represented that neither he nor any other Trustee would take any steps to transfer or attempt to transfer any other properties of the Debtor.

161.   Brizel asked the Debtor to delay his execution of a formal resignation document, and to delay a vote appointing new Trustees, until his attorneys could review and approve an English translation of the Initial Resolution Agreement.

162.   Brizel further promised the Debtor's members that he would not take any corporate actions on behalf of the Debtor in the interim and just needed the translation for his attorney to approve so he could resign.

163.   On or about November 18, 2013, the parties to the Members' Action executed an English version of the Initial Resolution Agreement, which was effective as of November 15, 2013 (the "Final Resolution Agreement").

164.   At that time, Glatzer and Brizel executed formal resignations from the Debtor as officers and directors as well.

165.   In the Final Resolution Agreement, Brizel, Friedman and Glatzer represented that they had "disclosed all current [Debtor] debts and obligations of which they are aware."

166.   Notwithstanding their representations to the Debtor and its members, Brizel, Friedman and Glatzer participated in the attempted transfer of title to the Route 45 Property to Bais Chinuch subsequent to the November 10, 2013 meeting with the Debtor's members and further failed to disclose all current debts and obligations which they had caused the Debtor to improperly incur.

### X.    The Frivolous "Defense" of the State Action

167.   When the Debtor learned of the Defendants' illegal and unauthorized attempt to convey the Route 45 Property to themselves for virtually no consideration, the Debtor commenced an action in the Supreme Court against Bais Chinuch seeking to set aside the fraudulent Route 45 Property Deed and the Route 45 Property Lease on the basis that they were made in violation of the RCL, the NCL and/or the Debtor's By-Laws (Index Number 036561/2013) (the "Bais Chinuch State Action").

168.   The Defendants, ostensibly acting on behalf of Bais Chinuch, frivolously and repeatedly attempted to delay the adjudication of the Bais Chinuch State Action to the Debtor's detriment.

169.   First, Bais Chinuch frivolously asserted that a purported arbitration agreement existed which divested the Supreme Court of jurisdiction to determine the validity of either the Route 45 Property Deed or the Route 45 Property Lease.

170.   Then, and after the Route 45 Property Deed had been set aside by the Supreme Court, Bais Chinuch frivolously asserted that a constructive trust should be imposed on the Route 45 Property.

171.   Bais Chinuch also filed Notices of Pendency against the Route 45 Property, falsely claiming that ownership to the Route 45 Property was in dispute.

172.  Bais Chinuch further frivolously claimed that Glatzer was authorized to execute the Route 45 Property Lease on behalf of the Debtor.

173.  Bais Chinuch then presented false testimony from Glatzer, Schwartz and Friedman.

174.  Finally, Bais Chinuch presenting a fabricated document in an attempt to avoid summary judgment being granted in favor of the Debtor.

175.  The actions of the Defendants in these regards were for the sole purpose of continuing the litigation and delaying their inevitable and legitimate ouster from the Route 45 Property.

176.  On February 27, 2015, the State Supreme Court, ruling on a fully-submitted motion for summary judgment filed by the Congregation, entered a Decision & Order which, *inter alia*:

- Granted the Summary Judgment Motion thereby setting aside the Route 45 Property Lease;

- Determined that the alleged Route 45 Property Lease was "of no legal force and effect *ab inito*;"

- Directed the Clerk of Rockland County to strike the Memorandum of Lease and the Notice of Pendency filed by Bais Chinuch from its records or mark same as void;

- Dismissed Bais Chinuch's counterclaims against the Debtor for constructive trust and monetary damages; and

- Sanctioned Bais Chinuch on account of its frivolous conduct (as described above) in the form of an award of legal fees, costs and disbursements in favor of the Debtor.

177.  The actions of the Defendants in the Bais Chinuch State Action contributed to the Debtor being unable to take actions necessary to protect its interests with respect to the TD Bank mortgage and/or other obligations.

## CLAIMS FOR RELIEF

## COUNT I: MONETARY DAMAGES
### [BREACH OF FIDUCIARY DUTY]

178.  The Debtor repeats, reiterates and re-alleges each and every allegation heretofore set forth herein, with the same force and effect as though more fully set forth herein at length.

179.  Defendants Glatzer, Friedman, Brizel and Schwartz, as purported officers and/or Trustees of the Congregation, owed a fiduciary duty to the Congregation to act in its best interests at all times.

180.  Defendants breached their fiduciary duty to the Debtor by acting in their own self-interest, and adverse to the best interests of the Debtor, by, among other things:

• In March of 2009, Glatzer created and delivered the Fraudulent Guardian Letter, falsely representing (among other things) that the Debtor had agreed to pay the premiums on the Glatzer Life Insurance Policy, and containing the forged signature of Aron Markowitz, and caused the Debtor to make such premium payments purportedly based thereupon;

• In January of 2012, the Defendants unnecessarily caused the Debtor to borrow the sum of $7,700,000.00 from TD Bank and cross-collateralized the amount borrowed from TD Bank with mortgages against several other properties which the Debtor owned which were otherwise unencumbered, and refused to permit escrow for insurance, taxes and other normal escrow items;

• Subsequent to the transactions with TD Bank in January of 2012, the Defendants have not fully accounted for the disposition of the TD Bank Loan Surplus once they were released to the Debtor by TD Bank and while under the care and supervision of the Defendants;

• In December of 2012, the Defendants allowed the Debtor to default under the TD Bank Loan, even though funds should have been available to timely make payments on the same;

- The Defendants (through Defendant Rottenberg) intentionally failed to pay insurance premiums for the Debtor's properties, although they were actually aware of the necessity to do that;

- In December of 2012, the Defendants allowed the Debtor to default in making certain required tax payments, even though funds should have been available to timely make payments of the same, thus causing the Debtor to incur penalties and interest and have tax liens filed against its properties which the taxing authorities have sought to foreclose;

- On or about September 14, 2012, Schwartz and Laufer entered into a secret agreement which purportedly installed Schwartz as the "spiritual leader" of Bais Chinuch, a girl's school that was supposed to be under the spiritual guidance of the actual spiritual leader of the Debtor, without the knowledge or consent of the Debtor;

- At multiple times during 2013, the Defendants claimed that Brizel was the President of the Debtor, and thereby authorized to act on behalf of the Debtor, when, in fact, Brizel was never voted into that (or any other) office by the Debtor;

- On or about April 16, 2013, the Defendants (through Brizel, and at the direction of Laufer) caused the Debtor to enter into a contract to sell the 4 Milton Place Property for the price of $1,000,000.00, far below the fair market value of the same, which sale was not in the best interests of the Debtor;

- In May of 2013, the Defendants (through Rottenberg, purportedly acting on behalf of the Debtor), entered into a secret and undisclosed collateral agreement with the purchaser of the 4 Milton Place Property which provided that: (a) the actual purchased price for the Property was to be $1,425,000.00; (b) the written contract of sale would nonetheless reflect a purported purchase price of only $1,000,000; (c) a cash payment of $200,000.00 would be made by the purchaser to

the Defendants' order at the closing, and (d) the sum of $200,000.00 would, at the election of the Defendants, either be added to the contract purchase price at the closing or paid to a "tax-deductible name" provide by Defendants;

- The Defendants failed to adhere to the applicable law, or the By-Laws, in connection with the attempted sale of the 4 Milton Place Property;

- The Defendants (through Brizel) falsely represented that a Notice of Special Meeting of the Debtor had occurred on April 15, 2013, that a vote had occurred at that time, and that the sale of the 4 Milton Place Property had been approved;

- The Defendants (through Defendant Rottenberg) directed the Debtor's Secretary to execute purported minutes of the purported meeting, which minutes were fabricated and did not accurately reflect any actual facts;

- On or about June 24, 2013, the Defendants (at the direction of Laufer) caused to be filed a petition with the Supreme Court to approve the sale of the 4 Milton Place Property, which Petition was signed by Brizel and contained multiple misrepresentations of purported fact;

- On or about June 14, 2013, the Defendants (through Brizel, and at the direction of Laufer) caused the Debtor to enter into a contract to sell the 78 South Main Street Property for the price of $1,200,000.00, far below the fair market value of the same, which sale was not in the best interests of the Debtor;

- The Defendants failed to adhere to the applicable law, or the By-Laws, in connection with the attempted sale of the 78 South Main Street Property;

- The Defendants (through Brizel) falsely represented that a Notice of Special Meeting of the Debtor had occurred on April 28, 2013, that a vote had occurred at that time, and that the sale of the 78 South Main Street Property had been approved;

- On or about September 11, 2013, the Defendants (at the direction of Laufer) caused to be filed a petition with the Supreme Court to approve the sale of the 78 South Main Street Property, which Petition was signed by Brizel and contained multiple misrepresentations of purported fact;

- The Defendants (through Rottenberg) directed the Debtor's Secretary to execute purported minutes of the purported meeting, which minutes were fabricated and did not accurately reflect any actual facts;

- On or about October 17, 2012, the Defendants (through Friedman, and at the direction of Laufer) caused the Debtor to enter into a written agreement to lease the 201 Route 306 Property for an annual rental of $400,000.00, with an option to purchase that Property for $6,500,000.00, below the fair market value of the same, which sale was not in the best interests of the Debtor;

- The Defendants failed to adhere to the By-Laws in connection with the attempted lease and sale of the 201 Route 306 Property;

- At the time of their execution of the purported Lease for the 201 Route 306 Property, the Defendants intended to divert part or all of the rental income derived therefrom to their own use;

- On or about October 18, 2012, the Defendants (through Laufer and Friedman) diverted the sum of $110,000.00, received as a rental payment for the 201 Route 306 Property, to their own use;

- In or about October of 2012, the Defendants entered into a secret and undisclosed agreement with the prospective purchaser of the 201 Route 306 Property that provided that the

Defendants would receive a secret cash "under-the-table" payment at the closing of that transaction;

- On or about May 1, 2013, the Defendants (through Friedman and Glatzer) opened a secret checking account in the name of the Debtor in KeyBank into which contributions to the Debtor from its benefactors were deposited, and, between May and November of 2013 used those funds exclusively for their own benefit;

- On November 18, 2013, the Defendants (at the direction of Laufer) caused to be recorded in the office of the Rockland County Clerk, a purported Deed dated November 17, 2013, which Deed was executed by Brizel and Glatzer (and certain ancillary documents to which were signed by Schwartz), purporting to convey the Route 45 Property to Bais Chinuch, an entity owned and controlled by the Defendants, for a purchase price of $10.00, an amount far below the fair market value of that Property;

- The Defendants failed to continue the existing charitable entity property tax exemption regarding the Route 45 Property and, as a result of the filing of the purported Deed, the Tax Assessor of Rockland County revoked the exemption, resulting in at least an additional $82,085.28 in property taxes being charged to the property for the 2013-2014 tax year, and which will result in additional charges on annual property tax bills being continued indefinitely into the future;

- On November 18, 2013, the Defendants (at the direction of Laufer) caused a purported "Memorandum of Lease" to be recorded in the office of the Rockland County Clerk, purporting to set forth the terms of lease dated October 17, 2013 and signed by Glatzer and Schwartz, which leased the Route 45 Property to Bais Chinuch, an entity owned and controlled by

the Defendants, for a period of four years at an annual rental price of One Dollar per year, and far below the fair market rental value of that Property;

- In or about February of 2014, the Defendants (through Schwartz) falsely alleged that a purported agreement dated June 1, 2008, containing an arbitration provision, had been authorized by the Spiritual Leader of the Debtor and was binding on the Debtor;

- From or about December of 2013 through at least February of 2015, the Defendants intentionally attempted to delay the adjudication of the Debtor's action in the Supreme Court seeking ownership and possession of the Route 45 Property; and/or

- On or about February 19, 2015, the Defendants falsely alleged that a purported "Certificate of Resolution" had been executed by Brizel and Schwartz on October 17, 2013 which purportedly authorized Glatzer to lease the Route 45 Property to Bais Chinuch, an entity owned and controlled by the Defendants, for a period of four years at an annual rental price of One Dollar per year.

181.   Upon information and belief, the Defendants may have engaged in additional improper, fraudulent and/or wrongful actions the existence of which is not yet known to the Debtor.

182.   At all times when the Defendants engaged in the acts described above, they had a fiduciary relationship with the Debtor.

183.   At all times when the Defendants engaged in the acts described above, Defendants had actual knowledge that they had a fiduciary duty to the Debtor which required that they act in the best interests of the Debtor at all times.

184.  At all times when the Defendants engaged in the acts described above, Defendants did so intentionally, with malice, and for the sole purpose of advancing their own interests at the expense of the interests of the Debtor.

185.  As a result of the breaches of fiduciary duty described above, the Debtor has incurred substantial monetary damages, including, among other things, substantial legal fees, the loss of rental income, various penalties and interest, the inability to protect its property resulting in a foreclosure action being commenced, the filing of the within chapter 11 petition, the loss of use of its property, and the potential permanent loss of part or all of its property.

186.  The exact amount of the Debtor's damages resulting from the breaches of fiduciary duty by Defendants is presently impossible to precisely calculate, however the Debtor reasonably believes its damages to be in excess of $1 million and may be as much as $22 million.

187.  Additionally, the acts of the Defendants, as above-described, were willful, wanton, malicious, and oppressive, were undertaken with intent to defraud the Debtor, a religious, not-for-profit, charitable organization, and justify the award of exemplary and punitive damages against Defendants.

## COUNT II: MONETARY DAMAGES
## [AIDING AND ABETTING BREACH OF FIDUCIARY DUTY]

188.  The Debtor repeats, reiterates and re-alleges each and every allegation heretofore set forth herein, with the same force and effect as though more fully set forth herein at length.

189.  If it is determined that any of the Defendants did not have a direct fiduciary duty to the Debtor, then their actions, as hereinabove described, rendered substantial assistance to those Defendants that did have such a fiduciary duty to the Debtor.

190.  At all times when the wrongful actions of a particular Defendant took place, each of the other Defendants had actual knowledge of the wrongful conduct on the part of such Defendant.

191.  At all times when the wrongful actions of a particular Defendant took place, each of other Defendants rendered substantial assistance to such Defendant in achieving the wrongdoing by either affirmatively assisting in the specific conduct, helping to conceal the same, or failing to act when required to do so, thereby enabling the breach to occur.

192.  As such, each of the Defendants has aided and abetted the other Defendants in breaching their fiduciary duty to the Debtor and is responsible to the Debtor for the damages incurred as a result.

193.  As a result of the Defendants' aiding and abetting the breaches of fiduciary duty described above, the Debtor has incurred enormous monetary damages, including, among other things, substantial legal fees, the loss of rental income, the inability to protect its property resulting in a foreclosure action being commenced, the filing of the within chapter 11 proceeding, the loss of use of its property, and the potential permanent loss of part or all of its property.

194.  The exact amount of the Debtor's damages resulting from the Defendants' aiding and abetting the breaches of fiduciary duty described above is presently impossible to precisely calculate, however the Debtor reasonably believes its damages to be in excess of $1 million and may be as much as $22 million.

195.  Additionally, the acts of the Defendants, as above-described, were willful, wanton, malicious, and oppressive, were undertaken with intent to defraud the Debtor, a religious, not-for-profit, charitable organization, and justify the award of exemplary and punitive damages against Defendants.

## COUNT III: MONETARY DAMAGES
### [FRAUD]

196.   The Debtor repeats, reiterates and re-alleges each and every allegation heretofore set forth herein, with the same force and effect as though more fully set forth herein at length.

197.   As was set forth above, in or about 2012, Defendants entered into a plan or scheme to: (a) convert funds and assets belonging to the Debtor, (b) divest the Debtor of all but one of its real properties; and (c) convert for themselves the remaining piece of real property for no consideration.

198.   From or about 2012 through at least November of 2013, Defendants repeatedly represented to the Debtor that they were acting in the best interests of the Debtor and would take no action to harm the Debtor.

199.   The Debtor reasonably relied upon those repeated representations in permitting certain of the Defendants to act on behalf of the Debtor.

200.   In truth and in fact, the representations by Defendants that they would act in the best interests of the Debtor were false when made, known by the Defendants to be false, and made for the specific purpose of inducing reliance thereupon by the Debtor.

201.   Among the specific misrepresentations made by the Defendants were the following:

•      Although Defendants Friedman and Glatzer represented that all funds received by the Debtor would be used for Debtor purposes, the same were diverted to the personal use of those Defendants.

•      Although Defendants represented that Brizel was the purported "President" of the Debtor, he was never duly elected as such and had no power to act as such;

- Although Brizel represented that no action would be taken by him or any of the Debtor's then-Trustees to encumber any property belonging to the Debtor, Brizel, Glatzer and Schwartz did, in fact, purport to transfer the Route 45 Property to Bais Chinuch, an entity owned and controlled by Defendants;

- Although Defendants represented that the purchase price for the 4 Milton Place Property was $1,000,000, in fact the actual purchase price was $1,425,000.00, with Defendants to pocket the excess personally;

- Although Defendants represented that the original purchase price for the 4 Milton Place Property was no more than $1.8 million, in fact the original purchase price was in excess of 2.6 million;

- Although the actual purchase price for the 201 Route 306 Property was $6,500,000.00, in fact Laufer offered to reduce the purchase price if Defendants were personally given a portion of the same in cash "bundled" under the table;

- Although on November 18, 2013, the Defendants represented in writing that they had disclosed all obligations of the Debtor of which they were aware, they specifically hid the fact that the Debtor had a purported obligation under a purported lease that they had given to Bais Chinuch, an entity which was owned and controlled by Defendants.

202.  The specific representations described above were intentionally made by Defendants with knowledge of their falsity, were made with malice, and were made for the sole intention of inducing the Debtor to rely upon the same.

203.  The Debtor reasonably relied upon the said misrepresentations to its detriment.

204.  As Trustees and/or officers of the Debtor, the Defendants had a duty to disclose all material facts to the Debtor

205.  Upon information and belief, the Defendants may have made additional fraudulent representations and/or omissions the existence of which is not yet known to the Debtor.

206.  As **a** result of the fraudulent scheme entered into by the Defendants, as above-described, and the specific misrepresentations made by the Defendants in furtherance thereof, the Debtor was caused to, and did, incur enormous monetary damages, including, among other things, substantial legal fees, the loss of rental income, the inability to protect its property resulting in a foreclosure action being commenced, the filing of the within chapter 11 petition, the loss of use of its property, and the potential permanent loss of part or all of its property.

207.  The exact amount of the Debtor's damages resulting from the Defendants' fraudulent scheme and specific misrepresentations described above is presently impossible to precisely calculate, however the Debtor reasonably believes its damages to be in excess of $1 million and may be as much as $22 million.

208.  Additionally, the acts of the Defendants, as above-described, were willful, wanton, malicious, and oppressive, were undertaken with intent to defraud the Debtor, a religious, not-for-profit, charitable organization, and justify the award of exemplary and punitive damages against the Defendants.

## COUNT IV: MONETARY DAMAGES AND ACCOUNTING
## [FRAUDULENT CONVERSION]

209.  The Congregation repeats, reiterates and re-alleges each and every allegation heretofore set forth herein, with the same force and effect as though more fully set forth herein at length.

210.  As was set forth above, the Debtor had clear legal and equitable ownership and rights in and to: (a) any funds received from any benefactors of or contributors to the Debtor; (b) the Route 45 property; (c) the Hamaspik Rent Payments; and (d) the GoAlliance Payments.

211.  As was set forth above, on May 1, 2013, Glatzer and Friedman opened the Secret Account at KeyBank without advising the Debtor, the Debtor's secretary and bookkeeper, or the Debtor's spiritual leader that they had done so.

212.  Friedman and Glatzer made themselves, and only themselves, signatories on the Secret Account and caused KeyBank to issued ATM/Debit cards to themselves.

213.  From May of 2013 through November 12, 2013, Glatzer and Friedman caused approximately $26,265.91 that was donated to the Debtor by benefactors or contributors to be deposited into the Secret Account and subsequently withdrew all of the funds from the Secret Account and used the same for their personal benefit.

214.  As such, Glatzer and Friedman converted the sum of $26,265.91 from the Congregation.

215.  Additionally, as set forth above, on or about November of 2013, the Defendants purportedly leased and conveyed to Bais Chinuch, an entity which was owned and/or controlled by the Defendants, the Route 45 Property for no consideration.

216.  The Defendants have occupied, and continue to occupy, the Route 45 Property to the exclusion of the Debtor, despite the Debtor's repeated demands to return the same to the Debtor, and despite the State Supreme Court's ruling that the Route 45 Property Lease is void *ab initio*, and continue to receive rental income from that property based upon a sub-let to an entity known as Bais Malka Belz school.

217.  As such, the Defendants have converted the Route 45 Property, and the income derived therefrom, to the Debtor's damages in an amount to be proven at trial.

218.  As also set forth above, Rottenberg converted at least one of the GoAlliance Payments in the amount of $50,000.00 for his own personal benefit, or for the benefit of one or more of the other Defendants.

219.  Additionally, upon information and belief there are other funds of the Debtor which should have been in the bank accounts of the Debtor and available to pay Debtor expenses, but which funds are not presently located therein.

220.  The information and belief for the allegation in the prior paragraph of this Complaint is that, in or about September of 2011, the spiritual leader of the Debtor hired a Certified Public Accountant, Devorah Sheingarten, to examine the financial condition of the Debtor and report her findings to the Debtor's spiritual leader.  Rottenberg, however, intercepted the report and hid it from the Debtor's spiritual leader.

221.  Similarly, in 2012 the Debtor's spiritual leader decided to make an unannounced visit to the Debtor's head office to, among other things, personally review the Debtor's books and financial records

222.  When the Defendants learned of the fact that the spiritual leader was on the way, they intentionally destroyed physical files and erased digital files so that the spiritual leader would not be able to gain access to the same.

223.  Similarly, in 2012, the spiritual leader of the Debtor hired Zecharia Wexler (from Abe Roth & Co.), an independent CPA approved by TD Bank, to review the financial records of the Debtor and to provide a report to the spiritual leader and TD Bank

224.  The Defendants refused to provide relevant information to the said CPA.

225.  Unless the Defendants are directed to account for any funds that they received from, or transferred from, the Debtor's bank accounts when Defendants were in control of the same, and

the rental income they have received from the sub-letting of the Route 45 Property, the Debtor will

not be able to trace, and/or attempt to retrieve, those funds.

226.   As such, the Defendants should be made to account for all of their dealings with

Debtor funds during the time period they were in control of the same, as well as all rental income

they have received from the sub-letting of the Route 45 Property.

227.   Additionally, the acts of the Defendants, as above-described, were willful, wanton,

malicious, and oppressive, were undertaken with intent to defraud the Debtor, a religious, not-for-

profit, charitable organization, and justify the award of exemplary and punitive damages against

the Defendants.

### COUNT V: EQUITABLE RELIEF AVOIDING AGREEMENT
### [FRAUD IN THE INDUCEMENT]

228.   The Debtor repeats, reiterates and re-alleges each and every allegation heretofore set

forth herein, with the same force and effect as though more fully set forth herein at length.

229.   As was set forth above, or about November 15, 2013, the Initial Resolution

Agreement among certain of the Defendants and certain members of the Debtor was entered into.

230.   The Initial Resolution Agreement is executory, and has not yet been fully performed.

231.   At the time that the Initial Resolution Agreement was executed, Defendants had a

duty to disclose to the Debtor's members any facts which were relevant to the subject matters set

forth therein.

232.   Defendants committed actual fraud in the inducement of the Initial Resolution

Agreement by affirmatively misrepresenting, on November 10, 2013, that they had no intention

to take any steps to transfer any properties of the Debtor nor any other corporate action between

then and their subsequent resignations.

233.   That representation was false when made because the Defendants knew that they intended to convey the Route 45 Property to themselves within days of making the said representation, and in fact actually did so.

234.   The Defendants also committed constructive fraud in the inducement by failing to disclose that they had (a) converted Debtor funds to their own use, and (b) purportedly leased the Route 45 Property to themselves the prior month, but had not filed the Lease (or any Memorandum thereof) with the Rockland County Clerk's office.

235.   The Defendants had a duty to disclose such information because they were in a fiduciary relationship with the Debtor at the time, had knowledge superior to the Debtor as to those facts, and were actually aware that the Debtor was not aware of those facts.

236.   Had the Debtor been aware that Defendants had purportedly leased the Route 45 Property to themselves, or had the Debtor been aware that the Defendants had converted funds belonging to the Debtor to themselves, or had the Debtor been aware that Defendants intended to execute a purported deed conveying the Route 45 Property to themselves, the Debtor's members would not have entered into the Initial Resolution Agreement.

237.   As such, the Initial Resolution Agreement and the Final Resolution Agreement (which was merely an English translation of the Initial Resolution Agreement written in Hebrew) are void or voidable, and the Debtor elects to avoid the same.

238.   Unless this Court declares the Initial Resolution Agreement and the Final Resolution Agreement to be null and void, the Defendants will continue to assert the validity of the same to the detriment of the Debtor.

**WHEREFORE**, the Debtor respectfully demands Judgment, against Defendants jointly and severally, as follows:

1. Upon the First Count, monetary damages in an amount established at trial, together with exemplary or punitive damages in an amount deemed sufficient by the trier of fact;

2. Upon the Second Count, monetary damages in an amount established at trial, together with exemplary or punitive damages in an amount deemed sufficient by the trier of fact;

3. Upon the Third Count, monetary damages in an amount established at trial, together with exemplary or punitive damages in an amount deemed sufficient by the trier of fact;

4. Upon the Fourth Court, (a) monetary damages in the amount of $26,265.91, (b) monetary damages found to have been incurred as a result of the loss of use by the Debtor of the Route 45 Property, (c) monetary damages in the amount of the Hamaspik Payments believed to total not less than $30,000.00, (d) monetary damages in the amount of the GoAlliance Payments believed to total not less than $50,000.00, (e) an Order directing the Defendants to account for any funds that they received from, or transferred from, the Debtor's bank accounts when the Defendants were in control of the same, (f) an Order directing the Defendants to account for any funds that they received from the sub-letting of the Route 45 Property, and (g) exemplary or punitive damages in an amount deemed sufficient by the trier of fact;

5. Upon the Fifth Court, an Order declaring the Initial Resolution Agreement and the Final Resolution Agreement to be null and void, and of no legal effect, *ab initio*; and

6. Upon all Counts, the costs and disbursements of this action, reasonable attorneys fees, such pre-judgment interest as is deemed appropriate, and such other, further and different relief as to the trier of fact may seem equitable and appropriate.

Dated: April 29, 2015

**PICK & ZABICKI LLP**

By:   **/s/Douglas J. Pick**
Douglas J. Pick, Esq.
Eric C. Zabicki, Esq.
*Counsel to the Debtor*
369 Lexington Avenue, 12th Floor
New York, New York 10017
(212) 695-6000


Levine & Associates, P.C.

By:   **/s/Michael Levine**
     Michael Levine, Esq. (ML5153)
*Proposed Special Litigation Counsel
to the Debtor*
15 Barclay Road
Scarsdale, NY  10583
(914) 600-4288